COURT OF APPEALS OF VIRGINIA

Present:    Judges Frank, McClanahan and Petty
Argued by teleconference


LOTHARIO SWIGGETT

MEMORANDUM OPINION[*] BY
v.       Record No. 1901-08-1          JUDGE ELIZABETH A. McCLANAHAN
                                        FEBRUARY 9, 2010
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Christopher W. Hutton, Judge[1]

John E. Robins, Jr. (Office of the Public Defender, on brief), for
appellant.

Karen Misbach, Assistant Attorney General II (William C. Mims,
Attorney General, on brief), for appellee.


Lothario Swiggett appeals from his conviction in a bench trial for grand larceny of a string

trimmer and argues the evidence was insufficient to prove his commission of the larceny and the

value of the string trimmer.  We affirm the judgment of the trial court.

I.  STANDARD OF REVIEW

"On review of a challenge to its sufficiency, we view the evidence in the light most

favorable to the Commonwealth, the party prevailing below, and grant to it all reasonable

inferences fairly deducible therefrom."  Nolen v. Commonwealth, 53 Va. App. 593, 595, 673

S.E.2d 920, 921 (2009).  "Sufficiency-of-the-evidence review involves assessment by the courts

of whether the evidence adduced at trial could support any rational determination of guilt beyond

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Although Judge Christopher W. Hutton entered the final order, Judge Walter J. Ford
presided over the trial in this case.

a reasonable doubt." United States v. Powell, 469 U.S. 57, 67 (1984). See also McMillan v. Commonwealth, 277 Va. 11, 19, 671 S.E.2d 396, 399 (2009); Jones v. Commonwealth, 277 Va. 171, 182, 670 S.E.2d 727, 734 (2009); Clanton v. Commonwealth, 53 Va. App. 561, 566, 673 S.E.2d 904, 906-07 (2009) (*en banc*).

## II. BACKGROUND

Joed Matthew Bruce, sole owner of Ashcraft Tree & Stump, LLC, performed a routine "security lockup" on his business property before leaving the premises for the evening. He walked the perimeter of the property and verified all pieces of large equipment were on the property and properly locked. Bruce verified that the front doors of a ten-foot by twelve-foot wooden storage shed were locked with the reinforced locking mechanisms intact.[2] A farm tractor was backed up against the shed doors as additional security. After Bruce drove off the property, he shut and locked the perimeter fence behind him as well as both gates to the property. He drove to the end of the road, on which his property and two adjacent properties are located, and shut and locked the vehicle barricade. The next evening, Bruce returned to the shed and found the perimeter fence intact and both gates still locked. The farm tractor was still backed up against the shed. However, the top corner was broken off one of the shed doors such that it left a two-foot by two-foot hole. Bruce noticed that a three-foot-tall yellow metal stand, which had been located on the backside of a pile of wooden timbers next to the shed, had been moved to the front side of the shed. After he started the tractor and pulled it away from the shed, he opened the doors, and realized immediately that the twenty-inch string trimmer, which had been sitting right inside the door, was gone. He also saw what appeared to be blood on a file cabinet inside the shed. Outside the shed, Bruce noticed yellow paint and impact marks next to the hole in the

---

[2] Inside the shed were a string trimmer, a brush trimmer, a lawn mower, large horsepower mower, hand tools, gas, oil, consumable supplies, as well as file cabinets for gloves, ear plugs, dust masks, goggles, and the like.

shed door. Additionally, Bruce observed what appeared to be blood on the yellow stand. Bruce testified he did not see any blood inside or outside the shed when he inspected it the evening before the larceny.

Officer John Wallace of the Hampton Police Department responded to the larceny reported by Bruce and collected swabs of blood left on the metal stand and the tractor that had been backed up against the shed. He also collected a sample of suspected blood on the right side door of the shed and from a cabinet inside the shed. Detective Barker of the Hampton Police Department, who supervised the investigation, collected buccal swabs from Swiggett and sent those to the Virginia Department of Forensic Science in Norfolk for testing and comparison with the blood swabs collected at the scene. According to Ruth Neely, who conducted the testing, the substances collected from the metal stand and door of the shed were blood, but she was unable to obtain DNA from the door sample. She did obtain DNA from the sample collected from the metal stand, which was a match with Swiggett's DNA. Having obtained a match with the first sample, Neely did not test the other two samples.

Bruce testified he had never seen Swiggett before and did not know of any reason Swiggett would have been on his property. When asked to explain how his blood came to be on the metal stand, Swiggett testified he used to bring in dumpsters for Old Dominion Metals "in that area around this property" and more specifically "to the building next door." According to Swiggett, "[t]hey drop metal in and then I come back and I pick them up out there." Swiggett denied stealing the string trimmer. He admitted he was a convicted felon.

### III. LARCENY OF THE STRING TRIMMER

Larceny has been defined as "the wrongful or fraudulent taking of another's property without his permission and with the intent to permanently deprive the owner of that property." Britt v. Commonwealth, 276 Va. 569, 574, 667 S.E.2d 763, 765 (2008). The evidence proved

when Bruce arrived at his property on the evening following the larceny, a metal stand that was ordinarily kept on the backside of the shed had been moved to the front. Blood was found on that stand, and yellow paint and impact marks were on the shed near the area that had been broken. Bruce thoroughly inspected his property the evening before the theft and saw no blood inside or outside the shed. It was reasonable for the fact finder to infer the yellow stand was moved by the thief to the front of the shed and used to reach the top of the door that was broken open. It was further reasonable for the fact finder to infer that when the thief used the stand to reach the top of the shed door, yellow paint and impact marks were left on the shed and the thief's blood was deposited on the stand during the larceny.

DNA testing proved the blood on the stand belonged to Swiggett. Although Swiggett complains that the other samples were not compared to his DNA, "the mere presence of the [DNA] of other persons . . . would not have exonerated defendant or explained the presence of his [DNA]." Avent v. Commonwealth, 209 Va. 474, 477, 164 S.E.2d 655, 657 (1968) (Court rejecting defendant's argument there were other fingerprints not identified where expert testified that once a positive identification was made with one fingerprint, no further comparisons with other fingerprints were made). And while Swiggett's testimony may have explained his prior presence in the "area around the property," it certainly did not explain the presence of his blood on the metal stand that was located *on* the property and used in the larceny.[3] Moreover, the trial court was free to disbelieve Swiggett's testimony.[4]

---

[3] "Where the accused takes the stand in his own behalf and voluntarily testified for himself, he may not stop short in his testimony by omitting and failing to explain incriminating circumstances and events already in evidence, in which he participated and concerning which he is fully informed, without subjecting his silence to the inferences naturally to be drawn from it." Wells v. Commonwealth, 32 Va. App. 775, 786, 531 S.E.2d 16, 21 (2000) (quoting Caminetti v. United States, 242 U.S. 470, 494 (1917)).

[4] "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his

In sum, the evidence proved Swiggett's blood was deposited on the metal stand when it was used to commit the larceny of the string trimmer and was sufficient to support the finding that Swiggett committed the larceny.

## IV. VALUE OF THE TRIMMER

To convict Swiggett of grand larceny, the Commonwealth was required to prove the value of the stolen trimmer was at least $200. Code § 18.2-95(ii). The relevant value is the "current value" of the stolen item, Dunn v. Commonwealth, 222 Va. 704, 705, 284 S.E.2d 792, 792 (1981) (*per curiam)*, "measured as of the time of the theft," Parker v. Commonwealth, 254 Va. 118, 121, 489 S.E.2d 482, 483 (1997). Although the original purchase price of an item is some evidence of its current value, there must be "due allowance for elements of depreciation" to reflect the "effect[s] of age and wear and tear on the value of an item." Dunn, 222 Va. at 705, 284 S.E.2d at 792. Generally, "the opinion testimony of the owner of personal property is competent and admissible on the question of the value of such property, regardless of the owner's knowledge of property values." Walls v. Commonwealth, 248 Va. 480, 482, 450 S.E.2d 363, 364 (1994). Another non-expert, non-owner, may testify "provided the witness possesses sufficient knowledge of the value of the property or has had ample opportunity for forming a correct opinion as to value." Id. at 483, 450 S.E.2d at 365.

Bruce testified the trimmer was "a $400 unit," although he believed he actually paid more than that. According to Bruce, the trimmer was less than a year old, had been used approximately six times, and was in "very good shape." Because Bruce is the sole owner of the company, purchased the trimmer in that capacity, and had knowledge of its use and condition, his testimony

---

guilt." Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998). The trial judge was also entitled to consider Swiggett's prior felony conviction in assessing his credibility. See Code § 19.2-269.

was competent on the issue of the value of the string trimmer and was sufficient to establish its value was at least $200.

## V.  CONCLUSION

For the foregoing reasons, we conclude the evidence was sufficient to support Swiggett's conviction for grand larceny and affirm the judgment of the trial court.

<u>Affirmed.</u>